Slip Op. 22-4

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| POSCO,<br><br>     Plaintiff,<br><br>NUCOR CORPORATION,<br><br>     Consolidated Plaintiff,<br><br>     and<br><br>AK STEEL CORPORATION, ET AL.,<br><br>     Consolidated Plaintiff-Intervenors,<br><br>     v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>     and<br><br>STEEL DYNAMICS, INC., ET AL.,<br><br>     Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge<br>Consol. Court No. 16-00225<br><br>**PUBLIC VERSION** |

## <u>OPINION</u>

[Sustaining Commerce's Second Remand Results.]

Dated: January 21, 2022

<u>Alan H. Price</u>, <u>Robert E. DeFrancesco, III</u>, and <u>Adam M. Teslik</u>, Wiley Rein LLP, of Washington, DC, for Consolidated Plaintiff Nucor Corporation. With them on the brief were <u>Timothy C. Brightbill</u> and <u>Laura El-Sabaawi</u>.

<u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General and <u>Jeanne E. Davidson</u>, Director. Of Counsel on the brief was <u>W. Mitchell Purdy</u>, Attorney, Office of

the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Barnett, Chief Judge:  In this consolidated action, Plaintiff POSCO ("POSCO"), Consolidated Plaintiff Nucor Corporation ("Nucor"), and Consolidated Plaintiff–Intervenors ArcelorMittal USA LLC, AK Steel Corporation, and United States Steel Corporation (collectively, "Plaintiff-Intervenors") challenged various aspects of the final determination of the U.S. Department of Commerce ("Commerce" or "the agency") in its countervailing duty ("CVD") investigation of cold-rolled steel products ("cold-rolled steel") from the Republic of Korea ("Korea").  *See Countervailing Duty Investigation of Certain Cold–Rolled Steel Flat Products From the Republic of Korea*, 81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016) (final aff. determination) ("*Final Determination*"), ECF No. 41–4, as amended by *Certain Cold–Rolled Steel Flat Products From Brazil, India, and the Republic of Korea*, 81 Fed. Reg. 64,436 (Dep't Commerce Sept. 20, 2016) (am. final aff. countervailing duty determination and countervailing duty order) ("*Am. Final Determination*"), ECF No. 41–3, and accompanying Issues and Decision Mem., C–580–882 (July 20, 2016) ("I&D Mem."), ECF No. 41–5.  The period of investigation ("POI") ran from January 1, 2014, to December 31, 2014.  *See Certain Cold–Rolled Steel Flat Products From Brazil, India, the People's Republic of China, the Republic of Korea, and the Russian Federation*, 80 Fed. Reg. 51,206 (Dep't Commerce Aug. 24, 2015) (initiation of countervailing duty investigations).

The court previously sustained Commerce's determination that the Government of Korea ("GOK") did not confer a benefit upon Korean producers of cold-rolled steel through the provision of electricity for less than adequate remuneration ("LTAR") and, thus, denied the U.S. Court of International Trade ("CIT") Rule 56.2 motion for judgment on the agency record filed by Nucor and Plaintiff-Intervenors.  *See generally POSCO v. United States*, 42 CIT __, __, 296 F. Supp. 3d 1320, 1354–63 (2018) (*"POSCO CIT"*).[1] On appeal, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") vacated and remanded Commerce's determination as "contrary to law and unsupported by substantial evidence."  *POSCO v. United States*, 977 F.3d 1369, 1371 (Fed. Cir. 2020) (*"POSCO CAFC"*).

Commerce has now filed its remand redetermination pursuant to *POSCO CAFC*. *See* Final Results of Redetermination Pursuant to Court Remand ("Second Remand Results"), ECF No. 135-1.  In the Second Remand Results, Commerce further explained its LTAR determination and addressed the flaws in its analysis identified by the Federal Circuit, but otherwise made no changes to the CVD rates determined in the *Amended Final Determination*.  *See id.* at 5–42.[2]

---

[1] *POSCO CIT* also addressed, and remanded, certain challenges to the *Final Determination* raised by POSCO; those challenges are not at issue here.  The court sustained Commerce's first remand redetermination in *POSCO v. United States*, 42 CIT __, 335 F. Supp. 3d 1283 (2018), and entered judgment accordingly.

[2] The administrative record associated with the *Final Determination* is divided into a Public Administrative Record ("PR"), ECF No. 41-1, and a Confidential Administrative Record ("CR"), ECF No. 41-2.  Nucor submitted joint appendices containing all record documents cited in the Parties' respective Rule 56.2 briefs.  *See* Public J.A., ECF No. 80; Confidential J.A. ("CJA"), ECF Nos. 77 (Tabs 1–9), 78 (Tabs 10–19), 79 (Tabs 20–

Nucor filed comments in opposition to the Second Remand Results.  *See* Conf. Nucor Corp.'s Cmts. in Opp'n to Final Results of Redetermination Pursuant to Court Remand ("Nucor's Opp'n Cmts."), ECF No. 137.  Defendant United States ("the Government") filed comments in support of the Second Remand Results.  *See* Def.'s Resp. to Cmts. on Second Redetermination ("Def.'s Reply Cmts."), ECF No. 139.[3]

For the following reasons, the court sustains Commerce's Second Remand Results.

---

45); Suppl. Public J.A., ECF No. 88-1; Suppl. Confidential J.A., ECF No. 87-1.  The administrative record associated with the Second Remand Results is also divided into a Public Remand Record, ECF No. 136-1, and a Confidential Remand Record, ECF No. 136-2.  Nucor submitted joint appendices containing record documents cited in Parties' respective comments on the Second Remand Results.  *See* Public Remand J.A., ECF No. 142; Confidential Remand J.A. ("CRJA"), ECF No. 141.  The Government submitted additional record documents pursuant to the court's request.  *See* Letter to the Court (Dec. 21, 2021), ECF No. 154; *see also* The Republic of Korea's Resp. to [CVD] Suppl. Questionnaire (Nov. 20, 2015) ("GOK's Suppl. Questionnaire Resp."), PR 302, CR 371, ECF Nos. 154-1 through 154-9.  The court references the confidential version of the relevant record documents, unless otherwise specified.

[3] Following briefing on the Second Remand Results, the court requested supplemental briefing on whether Nucor's objections to the Second Remand Results have become moot based on intervening events.  *See* Paperless Order (Oct. 26, 2021), ECF No. 146.  The Parties agree, and the court concurs, that Nucor's objections are not moot.  While this litigation will not alter the rate applicable to POSCO or any other Korean producer/exporter that has been examined in a subsequent administrative review pursuant to the underlying CVD order, the litigation may alter the all-others rate assigned to any non-examined respondent that has not been reviewed.  *See* Consol. Pl. Nucor Corp.'s Suppl. Br. Regarding Jurisdiction at 3–4, ECF No. 149; Def.'s Resp. to Consol. Pl.'s Suppl. Br. Regarding Jurisdiction at 3–4, ECF No. 152.

Consol. Court No. 16-00225                                                Page 5

BACKGROUND[4]

**A. CVD Overview**

Commerce "impose[s] countervailing duties on merchandise that is produced

with the benefit of government subsidies" when relevant statutory criteria are met.  *Fine*

*Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014); *see*

*also* 19 U.S.C. § 1671(a) (2012).[5]  A "[c]ountervailable subsidy" is one in which a foreign

government provides "a financial contribution . . . to a specific industry" that confers "a

benefit" on "a recipient within the industry."  *Fine Furniture (Shanghai)*, 748 F.3d at 1369

(citing 19 U.S.C. § 1677(5)(B)).  A countervailable benefit includes the provision of

goods or services "for less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).

The statute directs Commerce to determine the adequacy of remuneration "in

relation to prevailing market conditions for the good or service being provided or the

goods being purchased in the [subject] country" and explains that "[p]revailing market

conditions include price, quality, availability, marketability, transportation, and other

conditions of purchase or sale."  *Id.*  Commerce's regulations prescribe a three-tiered

approach for determining the adequacy of remuneration.  *See* 19 C.F.R. § 351.511.

When, as here, both an in-country market-based price and a world market price are

---

[4] While familiarity with *POSCO CIT* is presumed, relevant background is summarized
herein.
[5] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S.
Code, and all references to the United States Code are to the 2012 edition, unless
otherwise stated.

unavailable, Commerce conducts a "Tier 3" analysis, which considers "whether the government price is consistent with market principles." *Id*. § 351.511(a)(2)(iii).[6]

### B.  The Korean Electricity Market

Korea Electric Power Corporation ("KEPCO") is "a state-owned entity" and "the exclusive supplier of electricity in Korea." *POSCO CIT*, 296 F. Supp. 3d at 1331 (citations and footnote omitted).  In Korea, "electricity is generated by [i]ndependent power generators, community energy systems, and KEPCO's six subsidiaries." *Id.* (citation omitted) (alteration in original).  "By law, electricity must be bought and sold through the Korean Power Exchange ("KPX"), including by KEPCO." *Id.* at 1332.[7] Accordingly, "[e]lectricity generators sell electricity to the KPX, and KEPCO purchases the electricity it distributes to its customers through the KPX."  I&D Mem. at 50.

The price of electricity is determined through a "cost-based pool system."  The Republic of Korea's Resp. to CVD Questionnaire (Oct. 30, 2015) ("GOK's Questionnaire Resp."), Ex. E-3 at 31, CR 108–12, 114–27, PR 147–218, CJA Tab 9, CRJA Tab 2.[8] Under that system, the price of electricity has two principal components: (1) the marginal price (representing the variable cost of producing electricity, primarily, fuel

---

[6] Commerce first seeks to compare the government price to a market-based price for the good or service under investigation in the country in question (a "Tier 1" analysis). 19 C.F.R. § 351.511(a)(2)(i).  When an in-country market-based price is unavailable, Commerce will compare the government price to a world market price, when the world market price is available to purchasers in the country in question (a "Tier 2" analysis). *Id.* § 351.511(a)(2)(ii).

[7] "KEPCO and its subsidiaries own 100 percent of the KPX's shares." *POSCO CIT*, 296 F. Supp. 3d at 1332 n.17 (citation omitted).

[8] Exhibit E-3 consists of KEPCO's Form 20-F covering fiscal year 2014 and filed with the U.S. Securities and Exchange Commission in April 2015.

costs), and (2) the capacity price (representing the fixed cost of producing electricity).

*See id*.  "The variable cost . . . and the capacity price are determined in advance of

trading by the Cost Evaluation Committee."  *Id*.  The Cost Evaluation Committee

includes officials from the GOK, the KPX, KEPCO, and electricity generation

companies, as well as "scholars and researchers."  *Id*. at 32.  The "variable cost of each

generation unit is determined . . . on a monthly basis and reflected in the following

month based on the fuel costs two months prior to such determination."  *Id*.[9]  "The

capacity price is determined annually . . . based on the construction costs and

maintenance costs of a standard generation unit" and "is applied equally to all

generation units, regardless of fuel types used."  *Id.* at 33.

To sell electricity, generators submit bids to the KPX to supply electricity for a

given hour one day in advance of trading.  *Id*. at 31.  "The generation unit with the

lowest variable cost of producing electricity . . . for a given hour is first awarded a

purchase order for electricity up to the available capacity of such unit."  *Id*. at 32.  The

KPX continues to award purchase orders, based on variable cost, "until the projected

demand for electricity for such hour is met."  *Id*.  "[T]he variable cost of the generation

unit that is the last to receive the purchase order for such hour" is referred to "as the

system marginal price."  *Id.*

---

[9] Each month, KEPCO's generating subsidiaries submit fuel cost data to the KPX.  *See*
GOK's Questionnaire Resp., Ex. KPX-1 (explaining submission requirements).

### C.  The Investigation

In the underlying proceeding, the petitioners, consisting of Nucor and other domestic steel producers, alleged that the GOK provided electricity for LTAR through "KEPCO's artificially low electricity rates."  Petitions for the Imposition of Antidumping and Countervailing Duties (July 28, 2015) at 4–5, CR 1–20, PR 1–19, CJA Tab 1. Following an investigation, Commerce determined that the GOK's provision of electricity was not for LTAR.  I&D Mem. at 45.

In reaching its decision, Commerce applied a Tier 3 analysis that considered whether "the prices charged by KEPCO [were] set in accordance with market principles through an analysis of KEPCO's price-setting method."  *Id.*  Commerce explained that it would not find a countervailable benefit when "the rate charged" to the respondents[10] was "consistent with the standard pricing mechanism" and the respondents were, "in all other respects, essentially treated no differently than other companies and industries which purchase comparable amounts of electricity."  *Id.* at 46.

Upon review of the record, Commerce found that the GOK applied "a single tariff rate" to industrial users throughout the POI, including the respondents.  *Id.*  Commerce also noted the absence of evidence indicating that the respondents were "treated differently from other industrial users of electricity that purchase comparable amounts of electricity."  *Id*.  With respect to costs, Commerce found that "KEPCO's standard pricing

---

[10] The mandatory respondents in the investigation consisted of POSCO and Hyundai Steel Co., Ltd., and are referred to herein as "the respondents."  Second Remand Results at 2.

mechanism used to develop its tariff schedule was based upon its costs" and, "[f]or the POI, KEPCO more than fully covered its cost for the industry tariff applicable to [the] respondents."  *Id.* at 50 & n.235 (citing GOK's Questionnaire Resp., Ex. E-23). Commerce explained that it did not request cost information from KEPCO's generation units because KEPCO's costs "are determined by the KPX" and, thus, KEPCO's "purchase price of electricity from the KPX" represented the relevant costs for purposes of understanding KEPCO's industrial tariff schedule.  *Id.* at 50.

### D.  *POSCO CIT*

The court sustained Commerce's LTAR determination.  *POSCO CIT*, 296 F. Supp. 3d at 1360–63.  The court's decision was consistent with CIT precedent addressing Commerce's LTAR determinations in other CVD investigations.  *See id.* at 1355 & nn.50–51 (citing *Maverick Tube Corp. v. United States*, 41 CIT __, __, 273 F. Supp. 3d 1293, 1296, 1308 (2017) (addressing Commerce's final negative determination in the CVD investigation of welded line pipe from Korea), and *Nucor Corp. v. United States*, 42 CIT __, __, 286 F. Supp. 3d 1364, 1370–71 (2018) ("*Nucor CIT*"), *aff'd* 927 F.3d 1243 (Fed. Cir. 2019) (addressing Commerce's final affirmative determination in the CVD investigation of corrosion-resistant steel products ("CORE") from Korea)).  Nucor appealed *POSCO CIT* to the Federal Circuit.  *See* Notice of Appeal, ECF No. 122.

### E. *Nucor CAFC*

While Nucor's appeal of *POSCO CIT* was pending, the Federal Circuit addressed issues relevant to this case in its decision affirming *Nucor CIT*.  *See Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019) ("*Nucor CAFC*").

In the action underlying *Nucor CAFC*, as in this case, Nucor challenged Commerce's method of examining the adequacy of remuneration and failure to investigate the "KPX's prices in relation to [the] KPX's own costs."  927 F.3d at 1248 (citing *Nucor CIT*, 286 F. Supp. 3d at 1369–75, 1377–80).  The CIT had sustained Commerce's methodology and declined to consider Nucor's arguments regarding the KPX based on Nucor's failure to exhaust those arguments before Commerce.  *See id.* (citing *Nucor CIT*, 286 F. Supp. 3d at 1375–77).  On appeal, while the majority rejected the Government's articulation of the legal standard for adequate remuneration,[11] the majority affirmed Commerce's determination based on the agency's finding that KEPCO had recovered its costs during the investigation period and Nucor's failure to exhaust its arguments regarding the KPX's costs and prices before the agency.  *Id.* at 1249.

---

[11] The Government had argued that Commerce was within its discretion to find no benefit when the rate charged by the relevant authority was "set by a 'consistent and discernible method'" and was non-preferential.  *Nucor CAFC*, 927 F.3d at 1249.  The majority instead concluded that the terms "remuneration," "compensation," and "adequate compensation" all "convey a familiar notion of payment that reflects the value of what is being paid for" and, "more pointedly, . . . do not suggest that nondiscrimination suffices for value equivalence."  *Id.* at 1250.  Defining "market principles" in relation to "fair value," the majority explained, harmonizes Commerce's regulation because Tier 1 and Tier 2 "rely on competitive-market prices" that "are tied to 'fair value.'"  *Id.* at 1253–54 (citations omitted).

Judge Reyna authored a dissenting opinion in which he agreed with the majority's analysis of the legal standard for adequate remuneration, but disagreed with the majority's affirmance of Commerce's determination based on evidence of KEPCO's cost recovery and the conclusion that Nucor had failed to exhaust its administrative remedies.  *See id.* at 1256, 1261–62 (Reyna, J., dissenting).

### F.  *POSCO CAFC*

Judge Reyna subsequently authored the Federal Circuit opinion in *POSCO CAFC* remanding the instant matter for reconsideration of Commerce's LTAR determination.  977 F.3d at 1370–71.  With respect to the LTAR standard, the appellate court relied on the majority's reasoning in *Nucor CAFC* to conclude that Commerce unlawfully relied "on price discrimination to the exclusion of a thorough evaluation of fair-market principles" when it found the absence of any "unlawful benefit."  *Id.* at 1376 (citing *Nucor CAFC*, 927 F.3d at 1251).

With respect to costs, the appellate court concluded that Commerce's cost-recovery analysis—limited to KEPCO's costs—was insufficient to support the agency's conclusion "that electricity prices paid to KEPCO by respondents are consistent with prevailing market conditions."  *Id.* at 1376.  The appellate court stated that the "KPX's pricing accounts for upwards of 90 [percent] of KEPCO's total cost" and, thus, Commerce could not "adequately investigate[] Korea's prevailing market condition[s] for electricity without a thorough understanding of the costs associated with generating and acquiring that electricity."  *Id.* at 1377.  Absent further investigation into such costs, the court explained, Commerce could not ascertain "whether a benefit was conferred by

way of the price charged by [the] KPX to KEPCO." *Id.*; *see also id.* at 1378 (explaining that "Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation") (citing 19 U.S.C. § 1677d).[12]   Accordingly, the appellate court remanded Commerce's *Final Determination* for further consideration of the KPX's role in the Korean electricity market.  *See id.* at 1378.

### G.  Second Remand Results

In the Second Remand Results, Commerce reconsidered and revised the benefit analysis underlying the *Final Determination,* addressing, in particular, the role of the KPX.  Commerce acknowledged that the KPX constituted an "authority" for purposes of 19 U.S.C. § 1677(5)(B), Second Remand Results at 9, and found that the KPX's price of electricity to KEPCO did not confer a countervailable benefit, *see id.* at 9, 16–18.

#### 1.  Legal Standard for Adequate Remuneration

Commerce addressed the issue of whether the agency had relied on a preferential price analysis for the *Final Determination*.  *See id.* at 9–12.  Commerce clarified that its analysis of KEPCO's industrial tariff classifications and associated rates complied with the statutory requirement to examine the "prevailing market conditions" for purposes of section 1677(5)(E)(iv).  *Id.* at 11–12.  Commerce explained that "KEPCO differentiates its industrial tariff classifications by both contract demand for

---

[12] Upon the discovery of the appearance of a subsidy that not was not alleged in the petition, section 1677d directs Commerce, *inter alia*, to investigate the potential subsidy if it is relevant "to the merchandise which is the subject of the proceeding."  19 U.S.C. § 1677d(1).

electricity and by low-voltage and high voltage," and that "[c]ontract demand is further

differentiated between customers with an electricity demand of between 4kW and

300kW and industrial customers with a contract demand of more than 300kW." *Id.* at 12

& nn.45–46 (citations omitted).  Commerce found that these delineations constitute the

"prevailing market conditions" surrounding the sale of electricity in Korea. *Id.* at 15.

Commerce further analyzed the way KEPCO calculated and allocated its costs in

order to set the prices that it charged during the POI and found that "KEPCO more than

fully covered its cost for the industrial tariff applicable to the respondents." *Id.* at 13 &

nn.49–50 (citing, *inter alia*, I&D Mem. at 43–51).  Commerce explained that this

analysis, in conjunction with the agency's finding that the prices the respondents paid

KEPCO were consistent with the tariff schedules in effect during the POI, met the

statutory standard for analyzing adequate remuneration. *Id.* at 14–16.

Commerce went on to analyze and reject Nucor's assertion that the agency had

continued to apply a preferential price analysis. *See id.* at 20, 27–35.  Commerce

explained that such an analysis would have focused on "whether the government is

providing more favorable treatment to some within its jurisdiction than to others within

that jurisdiction." *Id.* at 25.  Commerce also explained that its consideration of KEPCO's

"standard pricing mechanism" accounted for whether "the electricity tariffs charged to

the respondent covers cost plus a return." *Id.* at 30.  Commerce also explained that a

rate's consistency "with the standard pricing mechanism" and the lack of differential

treatment—meaning that "the rate charged to the respondent is from the correct tariff

classification based on its contract demand for electricity and voltage for that electricity

consumption"—disfavors finding a countervailable benefit.  *Id.* at 30–31.  Commerce

therefore concluded "that the methodology used in the *Final Determination* was

consistent with the [statute]."  *Id.* at 34–35.

### 2.  The KPX's Generating Costs

Consistent with the Federal Circuit's opinion, Commerce considered the role of

the KPX in providing electricity and the KPX's costs.  *See id.* at 16–18.  In so doing,

Commerce explained that the agency had investigated an upstream subsidy allegation

involving the KPX and KEPCO in the 2017 administrative review of the CVD order on

cold rolled steel from Korea and "determined that the electricity pricing system

established by [the] KPX is consistent with market principles and that a benefit was not

conferred."  *Id.* at 18 & n.61 (citing *Certain Cold-Rolled Steel Flat Products from the*

*Republic of Korea*, 85 Fed. Reg. 38,361 (Dep't Commerce June 26, 2020) (final results

of CVD admin. review; 2017) ("*2017 CRS Admin. Review*"), and accompanying Issues

and Decision Mem. for the Final Results of the 2017 Admin. Review, C-580-882 (June

22, 2020) ("2017 Decision Mem.") at Cmt. 1, available at https://access.trade.gov/

Resources/frn/summary/korea-south/2020-13813-1.pdf (last visited Jan. 21, 2022)).

Commerce recognized that its decision in that segment of the proceeding "confirms the

information on the [instant] record."  *Id.* at 18 (citing GOK's Questionnaire Resp. at 32–

33);[13] *see also id.* at 40–41.

---

[13] In the cited portion of its response, the GOK states that, during the POI, "[[

                                                                                      ]]."  GOK's Questionnaire

Resp. at 32–33.

With respect to such evidence on the instant record, Commerce explained that KEPCO's Form 20-F shows that the annual average KPX unit price associated with each of KEPCO's generating subsidiaries in 2014 exceeded their respective fuel costs during the same period. *See id.* at 39 & n.139 (citing GOK's Questionnaire Resp., Ex. E-3) (listing prices and costs for each subsidiary). Commerce also identified evidence confirming that KEPCO and its generating subsidiaries were profitable during the POI and that the KPX more than covered its costs. *See id.* at 39 & nn.140–41 (citing GOK's Questionnaire Resp., Ex. E-3 at F-9–F-10, F-41, F-68, F-75).[14] Based on the totality of this evidence, Commerce found that the KPX's pricing did not provide a countervailable benefit. *See id.* at 39–40.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[14] Commerce explained that, "[f]or [the] KPX, the only revenue recorded is an electricity transaction and membership fee." Second Remand Results at 39 & n.142 (citing GOK's Suppl. Questionnaire Resp. (Part 2), Ex. SR1-KPX-1 at 10 (note 3), 49). Commerce noted, however, that the "KPX also recovered costs during the period." *Id.* at 39 & n.143 (citing GOK's Suppl. Questionnaire Resp. (Part 2), Ex. SR1-KPX-1 at 9).

## DISCUSSION

### A. Parties' Contentions

Nucor contends that Commerce has articulated, but failed to properly apply, a standard for assessing adequate remuneration that complies with the statute.  Nucor's Opp'n Cmts. at 4 (citing Second Remand Results at 31).[15]  Nucor faults Commerce for failing to investigate "the actual costs" of electricity generation and supply and for basing the agency's cost analysis on KEPCO "as a whole and the broader tariff class applicable to the respondents" instead of whether "the prices actually paid by the respondents covered the cost of supply and an amount for profit."  *Id.* at 5; *see also id.* at 17.  Nucor faults Commerce for declining to request additional information regarding, or further investigating, the role of the Cost Evaluation Committee in the KPX's price-setting.  *Id.* at 10–12.  This information is relevant, Nucor contends, because the record indicates that "KEPCO's pricing structure creates *de facto* cross-subsidization" between different types of generators with different levels of fixed costs.  *Id.* at 16 (citation omitted).  Nucor further contends that Commerce's reliance on *2017 CRS Administrative Review* erroneously introduces an upstream subsidy issue instead of addressing whether the KPX's role in the Korean electricity market results in a benefit to

---

[15] According to Nucor, "[a] government price that covers the cost of production and supply, plus an amount for profit, and that is not otherwise less than the respondent should be charged, would be consistent with market principles" and an appropriate "benchmark" pursuant to Commerce's Tier 3 regulatory analysis and the statute. Nucor's Opp'n Cmts. at 4.

the respondents through KEPCO's prices.  *See id.* at 14–15 (citing Remand Results at 17–18).

The Government contends that Commerce's LTAR analysis is lawful and complies with *POSCO CAFC*.  Def.'s Reply Cmts. at 5.  The Government emphasizes Commerce's analysis of KEPCO's tariff classifications forming the basis for the prices paid by the respondents and KEPCO's profitability.  *See id.* at 6–7.  The Government also explains that Commerce's "step-by-step analysis of profitability" with respect to the generators, the KPX, and KEPCO "demonstrate[s] that KEPCO's prices to the respondents reflected adequate remuneration" and "there was no need for Commerce to request any . . . additional information."  *Id.* at 9–10.  The Government also contends that Commerce's determination in *2017 CRS Administrative Review* demonstrates the agency's verification of "the pricing structure between [the] KPX and KEPCO" and other aspects of the KPX's role in the Korean electricity market, thereby implying that Commerce's understanding of this record is consistent with, and confirmed by, its analysis in *2017 CRS Administrative Review*.  *Id.* at 12 (citing Second Remand Results at 41 n.148).

## B.  Analysis

As set forth above, Commerce determines the adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the [subject] country."  19 U.S.C. § 1677(5)(E)(iv).  Pursuant to a Tier 3 analysis, Commerce meets the statutory requirement by considering "whether the government price is consistent with market principles."  19 C.F.R.

§ 351.511(a)(2)(iii).  Commerce and Nucor broadly agree that the agency is within its discretion to find no countervailable benefit when the price of electricity covers the cost of production and provides for a return on investment and a respondent is not charged less than it should be charged.  *See* Nucor's Opp'n Cmts. at 4 (citing Second Remand Results at 31).

While Commerce's analysis of KEPCO's standard pricing mechanism fulfills, in part, the statutory requirement to determine the adequacy of remuneration in relation to prevailing market conditions, *see* Second Remand Results at 12–16, 32, the Federal Circuit found such analysis insufficient, by itself, to fully "support [the] conclusion that electricity prices paid to KEPCO by respondents are consistent with prevailing market conditions," *POSCO CAFC*, 977 F.3d at 1376.  *Cf. Nucor CAFC*, 927 F.3d at 1258 (Reyna, J., dissenting) (characterizing "Commerce's analysis . . . of how KEPCO distributed costs for the purpose of tariff rate proposals" as "limited," "technical," "cursory" and, ultimately, "insufficient to support the conclusion that the electricity prices paid by Korean CORE producers are consistent with prevailing market conditions and the full value of the assets received").  Instead, *POSCO CAFC* held that a thorough examination of the "prevailing market conditions" within the Korean electricity market must account for the "KPX's impact on the Korean electricity market" and "the costs associated with generating and acquiring electricity."  977 F.3d at 1376–77.  Resolution of this case thus turns on whether the additional cost analysis supplied by Commerce in the Second Remand Results is adequate to meet the guidance provided in *POSCO CAFC* and is supported by substantial evidence.

The court finds that Commerce's Second Remand Results must be sustained. Therein, Commerce fully addressed the prevailing market conditions, including the KPX's impact on the electricity market, and substantial evidence supports its determination that the KPX's prices to KEPCO do not provide a countervailable benefit. Nucor's arguments to the contrary are unpersuasive.

Nucor first argues that Commerce's failure to request or analyze data regarding the actual cost of electricity generation runs afoul of the Federal Circuit's holding in *POSCO CAFC*.  Nucor's Opp'n Cmts. at 13.  According to Nucor, the Federal Circuit held that Commerce's failure to request such information "constituted reversible error," *id.*, and, without the information, Commerce's analysis of the prevailing market conditions remains unlawfully limited to KEPCO's pricing mechanism, *id.* at 10.

While *POSCO CAFC* noted that "Commerce did not request information regarding the KPX's cost of electricity generation," 977 F.3d at 1377, the court did not direct Commerce to reopen the record in order to solicit that information.  Indeed, "the decision of whether or not to reopen a record following an order remanding an agency decision is a matter within the agency's discretion."  *Elkay Mfg. Co. v. United States*, 40 CIT __, __, 180 F. Supp. 3d 1245, 1260 (2016) (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012)); *see also Essar Steel*, 678 F.3d at 1278 (holding that the CIT erred by ordering Commerce to reopen the administrative record).  Commerce's Second Remand Results are not, therefore, unlawful solely because Commerce declined to request additional information.  Provided that Commerce based

its Second Remand Results on substantial evidence, Commerce need not have

reopened the administrative record on remand.

Nucor next argues that Commerce's analysis of the overall profitability of KEPCO

and its subsidiaries fails to establish that "KEPCO's prices to the respondents reflect the

full cost of generation and supply plus an amount for profit."  Nucor's Opp'n Cmts. at

15.[16]  According to Nucor, "KEPCO's pricing structure 'creates *de facto* cross-

subsidization, [through] which the majority of society . . . pays the highest government-

assigned prices in order to cover the fixed costs that are excluded from the government-

assigned prices paid to generators supplying electricity to off-peak, industrial

consumers' like the mandatory respondents in the investigation."  *Id.* at 16 (citation

omitted).  To support this argument, Nucor compares the lowest off-peak unit prices to

the annual average KPX unit price for the lowest cost generator.  *See id.* (citing Initial

Questionnaire Resp. (Oct. 23, 2015) ("POSCO's Questionnaire Resp."), Ex. A-2, CR

58–102, PR 120–138, CRJA Tab 1; Sec. III Initial Questionnaire Resp. (Oct. 30, 2015)

---

[16] Nucor also argues that Commerce failed to consider the KPX as part of the relevant
authority and instead "attempt[s] to transform" the *POSCO CAFC* court's holding "into
an upstream subsidy issue."  Nucor's Opp'n Cmts. at 14.  However, as Nucor concedes,
*see id.* at 15, Commerce acknowledged that the KPX is an "authority" for purposes of 19
U.S.C. § 1677(5)(B), *see* Second Remand Results at 8–9.  The question before the
court is whether Commerce adequately examined the KPX's role in the Korean
electricity market.  *See* Nucor's Opp'n Cmts. at 15 ("The KPX is thus an integral part of
the 'authority' under investigation, and its role in that authority's price-setting process
must be thoroughly examined in accordance with . . . *POSCO CAFC*.").

("Hyundai's Questionnaire Resp."), Ex. A-1, CR 218–55, PR 219–39, CRJA Tab 3);

Second Remand Results at 39 n.139).[17]

Commerce, however, cites record evidence confirming that, for the POI, the

KPX's pricing enabled KEPCO's generators to recover the cost of fuel to produce

electricity. *See* Second Remand Results at 39 & n.139 (listing the respective prices and

costs for each subsidiary in Korean Won per kilowatt hour ("kWh")).[18]  Nucor attempts to

undermine this finding, arguing that the KPX's prices are based on "costs assigned to

the generators by the Cost Evaluation Committee" rather than "the actual costs of

generating and supplying electricity."  Nucor's Opp'n Cmts. at 16 n.1 (emphasis

omitted).  Even if correct, Nucor's argument overlooks the fact that Commerce

compared the KPX's prices to the generators' actual POI-average fuel costs.  *See*

Second Remand Results at 39 n.139 (citing GOK's Questionnaire Resp., Ex. E-3 at 35,

40, 42–46).[19]

---

[17] Nucor cites record evidence reporting monthly average [[
            ]] Korean Won/kWh.  Nucor's Opp'n Cmts. at 16 (citing, *inter alia*,
POSCO's Questionnaire Resp., Ex. A-2; Hyundai's Questionnaire Resp., Ex. A-1.  Such
prices, Nucor contends, are [[          ]] "the lowest cost generator" that "sold electricity
through the KPX at a unit price of . . . 59.95" Korean Won per kWh.  Nucor's Opp'n
Cmts. at 16 (citing Second Remand Results at 39 n.139).
[18] Commerce incorrectly stated the average fuel cost for Korea Southern Power Co.,
Ltd. as 81.43 Won/kWh when KEPCO reported the amount as 91.43 Won/kWh;
however, this typographical error does not change the analysis because the KPX's
average unit price for that company—111.17 Won/kWh—still exceeds the average fuel
price.  *See* Second Remand Results at 39 n.139; GOK's Questionnaire Resp., Ex. E-3
at 45.
[19] KEPCO's Form 20-F contains the POI-average KPX price for each KEPCO subsidiary
and independent generator.  *See* GOK's Questionnaire Resp., Ex. E-3 at 35.  For
nuclear generators, KEPCO reported the "average fuel cost per kilowatt for 2014."  *Id.* at

Additionally, Commerce accounted for the actual fixed costs of producing electricity when it further explained that both KEPCO and, crucially, its generating subsidiaries "were profitable in 2014" to the extent that most of the subsidiaries "paid out cash dividends."  Second Remand Results at 39 & nn.140–41 (citing GOK's Questionnaire Resp., Ex. E-3 at F-9–F-10, F-41, F-68, F-75).  In other words, Commerce found that the KPX's prices allowed the generators to more than cover both fixed and variable costs.  *See id.*

Nucor's arguments regarding overall profitability focus on the respondents' off-peak electricity consumption.  *See* Nucor's Opp'n Cmts. at 15–16.  Although off-peak usage may be cheaper because electricity can be produced by nuclear generators that use cheaper fuels, *see* GOK's Questionnaire Resp. at 10 n.3, the respondents' electricity consumption was not limited to off-peak periods, *see* POSCO's Questionnaire Resp., Ex. A-2; Hyundai's Questionnaire Resp., Ex. A-1.[20]  Accordingly, the respondents' consumption was not limited to particular generators or fuel sources and Nucor's argument is inapposite.

Nucor's price comparison also lacks merit.  Nucor seeks to compare the lowest *monthly* average off-peak price paid by the respondents for certain months of the POI to the lowest *annual* average unit price paid to a KEPCO generator.  Nucor's Opp'n Cmts.

---

40.  For non-nuclear generators, KEPCO reported an annual average fuel cost per kilowatt in 2014 based upon the net amount of electricity generated."  *Id.* at 42–46.

[20] For example, roughly [[   ]] percent of POSCO's electricity was consumed during [[   ]] hours, with the remaining electricity consumed during [[   ]] hours.  POSCO's Questionnaire Resp., Ex. A-2 (POSCO's monthly electricity rates).

at 16; *see also* Second Remand Results at 39 n.139.  Given that the KPX set prices on

an hourly basis, *see* GOK's Questionnaire Resp., Ex. E-3 at 31–32, Nucor's

inconsistent cherry-picking of data fails to demonstrate that the respondents paid less

for their respective electricity consumption than was necessary to allow the generators

to recover the costs of supplying that electricity and it does not call into question

Commerce's analysis or conclusions.

In addition to the generators' demonstrated profitability, the KPX also recovered

its costs during the POI.  *See* Second Remand Results at 39 & n.143 (citing GOK's

Suppl. Questionnaire Resp., Ex. SR1-KPX-1 at 9 (the KPX's comprehensive income

statement)).  While the KPX's costs appear to be administrative, *see* GOK's Suppl.

Questionnaire Resp., Ex. SR1-KPX-1 at 9 (listing operating expenses), the KPX's

revenue, consisting of transaction and membership fees, allowed the KPX to more than

cover its costs for the POI, *see id.*, Ex. SR1-KPX-1 at 9–10, 49.  Additionally, KEPCO

was profitable overall and within the industrial tariff relevant to the respondents.  *See*

Second Remand Results at 11, 13, and 39; *see also* GOK's Questionnaire Resp., Ex.

E-3 at F-9 (KEPCO's comprehensive income statement); *id.*, Ex. E-23 (KEPCO cost

data for each tariff classification).

The additional cost recovery analysis Commerce conducted on remand fully

addresses the Federal Circuit's instruction to further investigate the KPX's role in the

Korean electricity market and the costs of electricity generation.  977 F.3d at 1378.

While Nucor may have preferred for Commerce to have used a different analytical

model to consider the KPX's costs, Commerce's model permitted it to make the

necessary statutory findings and otherwise address the deficiencies in its prior analysis identified in *POSCO CAFC*.  Within those broad parameters, it is Commerce, as the administering agency, that is to determine the analytical approach to establish whether a countervailable subsidy exists.  Commerce's determination that the KPX's pricing of electricity to KEPCO does not provide a countervailable benefit is in accordance with law and supported by substantial evidence.[21]

---

[21] The court reaches this conclusion without resort to Commerce's determination in *2017 CRS Administrative Review*.  *See* Second Remand Results at 40 (stating that, "[b]ecause Commerce has already conducted a thorough investigation and verification related to this issue" for the *2017 CRS Administrative Review*, "it is unnecessary to conduct a separate, additional, and duplicative investigation into the same issue for the purposes of this" remand proceeding).  It is well settled that each segment of a proceeding stands on its own record and that record is limited to the relevant period of investigation or review.  *See, e.g.*, *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016); *Tri Union Frozen Prods., Inc. v. United States*, 40 CIT __, __, 163 F. Supp. 3d 1255, 1292 (2016).  Commerce did not place relevant documents from the 2017 administrative review on the current record for the court's review.  Aspects of the Korean electricity market may have changed between this period of investigation and the period of review examined therein.  *See* 2017 Decision Mem. at 25 (discussing the 2015 implementation of a regulation governing compensation for KEPCO's subsidiaries in the event KEPCO incurs a net loss); GOK's Questionnaire Resp., Ex. E-3 at 33–35 (discussing the phased implementation of a "vesting contract" system, beginning in 2015, to replace the cost-based pool system).  Accordingly, Commerce could not rely solely on its verification of evidence on a separate record to meet the substantial evidence requirement in this segment of the proceeding.

Consol. Court No. 16-00225                                              Page 25

## CONCLUSION

In accordance with the foregoing, Commerce's Second Remand Results will be sustained.  Judgment will enter accordingly.

/s/      Mark A. Barnett____
Mark A. Barnett, Chief Judge

Dated: January 21, 2022__
        New York, New York